## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| KRISTINA NEVIUS | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No. 1:06CV01965 |
| | ) | Judge: Henry H. Kennedy |
| AFRICAN INLAND MISSION | ) | |
| INTERNATIONAL, INC., et al. | ) | |
| | ) | |
| Defendants. | ) | |

### Motion to Dismiss of African Inland Mission International, Inc.

COME NOW the Defendant African Inland Mission International, Inc., by Counsel, and

as its Motion to Dismiss pursuant to Rule 12(b)(1),(6), and (7) of the Federal Rules of Civil

Procedure states that the Court lacks subject matter jurisdiction over the matters raised in the

Complaint, the allegations in the Complaint fail to state a claim against African Inland Mission

International, Inc. upon which relief can be granted, and the Plaintiff has failed to join a party

under Rule 19 of the Federal Rules of Civil Procedure, and in support thereof files the attached

Memorandum of Law.  An oral hearing is requested.

Respectfully submitted,

African Inland Mission International, Inc.
By Counsel

GAMMON & GRANGE, P.C.

Timothy R. Obitts, Esq. DC Bar#478470
8280 Greensboro Drive, 7th Flr.
McLean, Virginia 22102
(703) 761-5000
(703) 761-5023 -facsimile-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 15th day of December, 2006, a true and accurate copy of the foregoing and attached draft Order was served by U.S. first class mail, postage prepaid, to the following:

Robert N. Kelly, Esq.
James B. Travis, Esq.
1120 Twentieth Street, NW
South Tower
Washington, DC 20036-3437

Timothy R. Obitts, Esq.

2

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

KRISTINA NEVIUS )
)
    Plaintiff, )
)
v. )          Case No. 1:06CV01965
)          Judge: Henry H. Kennedy
AFRICAN INLAND MISSION )
INTERNATIONAL, INC., et al. )
)
    Defendants. )

### ORDER

UPON CONSIDERATION of the Motion to Dismiss filed by the defendant African Inland Mission International, Inc., any opposition thereto, reply and oral argument, it is hereby

ORDERED, that this Court lacks subject matter jurisdiction over relief sought in the Complaint pursuant to Rule 12(b)(1) of the Federal Rules of Civil Procedure for the reasons stated in African Inland Mission International, Inc.'s Memo of Law in Support of Motion to Dismiss, and the Complaint is dismissed,

ORDERED, that Count II (Violation of the District of Columbia Human Rights Act) and Count III (Defamation) of the Complaint are barred by the applicable statute of limitations and are dismissed With Prejudice,

ORDERED, that Counts I, II, III, IV, V, and VI of the Complaint fail to state a claim upon which this Court may fashion relief and are dismissed With Prejudice,

ORDERED, that the Complaint is dismissed pursuant to Rule 12(b)(7) of the Federal Rules of Civil Procedure for the failure by Plaintiff to join necessary parties.

ENTERED this _____ day of _____, 200_____.

_____
The Honorable Henry H. Kennedy, Jr.
JUDGE

# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

KRISTINA NEVIUS )
)
     Plaintiff, )
)
v. )     Case No. 1:06CV01965
)     Judge: Henry H. Kennedy
AFRICAN INLAND MISSION )
INTERNATIONAL, INC., et al. )
)
     Defendants. )

## Memorandum of Law in Support of Motion to Dismiss

COMES NOW the Defendant African Inland Mission International, Inc. ("African Inland Mission")[1], by Counsel, and as its Memorandum of Law in Support of Motion to Dismiss pursuant to Rule 12(b)(1), (6), and (7) of the Federal Rules of Civil Procedure states as follows:

## Introduction

Africa Inland Mission is a Christian nonprofit missionary organization that has been actively carrying the Gospel of Jesus Christ to the peoples of Africa for more than a century since its founding in 1895. Africa Inland Mission submits this Memorandum of Law in support of its Motion to Dismiss the Complaint in this matter. The Complaint must be dismissed under Rules 12(b)(1), (6) and (7) for several independent reasons.

First, Counts I, II, IV, V, and VI of the Complaint must be dismissed for lack of subject

---

[1] Plaintiff has also sued Africa Inland Mission International "AIM International" in this matter, alleging that it "is an international Christian missionary organization with its principal headquarters in Bristol, England and that as such it is deemed a citizen thereof." Complaint ¶5. Plaintiff attempted service on AIM International by mailing a copy to African Inland Mission. Counsel for Defendant has informed counsel for Plaintiff that African Inland Mission is not accepting service on behalf of AIM International and that proper service on AIM International must occur.

1

matter jurisdiction under Rule 12(b)(1). The First Amendment to the United States Constitution and the well-established "ministerial exception" that has developed thereunder, prohibit this Court from exercising subject matter jurisdiction over Plaintiff's allegations that Africa Inland Mission's religious decisions regarding who may serve as a religious missionary under its authority, regarding the religious duties and religious activities that such missionaries shall perform, and regarding how Africa Inland Mission may oversee its missionaries and its various missions projects in the performance of such religious duties and services.

Second, Counts II (Violation of DC Human Rights Act) should be dismissed pursuant to Rule 12(b)(1) and (6) as the alleged wrongdoing occurred outside of the District of Columbia and the DC Human Rights Act only applies to wrongful acts occurring inside the District of Columbia.

Third and independently, all of Plaintiff's Counts must be dismissed under Rule 12(b)(6) for failure to state a claim upon which relief may be grant. Counts II and III must be dismissed under Rule 12(b)(6) because they are barred, on the face of the Complaint, by applicable statutes of limitation. The most recent events alleged in the Complaint occurred on or before April 5, 2005. The causes of action alleged in Counts II and III are all subject to one-year statutes of limitations. Count IV must be dismissed because having alleged the existence of a contract, Plaintiff as a matter of law cannot maintain a cause of action for unjust enrichment. Count V must be dismissed because Plaintiff has failed to allege the required elements of a claim of conversion. Similarly, Count VI must be dismissed because, as a matter of law, Section 170 of the Internal Revenue Code does not permit a trust to be created for Plaintiff's personal benefit. Likewise, the allegations in Count I, IV, V and the requested relief are in clear violation of Section 170 of Internal Revenue Code as the Plaintiff claims that charitable contribution made to African Inland Mission were for her personal benefit.

2

Finally, Count I, IV, V and VI of the Complaint should be dismissed pursuant to Rule 12(b)(7) of the Federal Rules of Civil Procedure for failure to join indispensable parties as the relief requested by the Plaintiff would have the consequence of making the donation not tax deductible for all donors who gave charitable donations to African Inland Missions to support missions efforts in Namibia, of which Plaintiff was a part.

At the end of the day, Plaintiff's claims are quite surprising in their audacity and disregard for the tax laws of the United States. On the face of it, it could be construed that Plaintiff conspired to commit a fraud on (or with) certain taxpayers making charitable donations, on Africa Inland Mission, and on the Internal Revenue Service. The potential implications of the Complaint's allegations for Plaintiff and for the taxpayers who made charitable contributions to Africa Inland Mission and tax deductions for the same and whom she now alleges were instead attempting to conduit private gifts to her in violation of the federal tax laws are very alarming.

## Background

African Inland Mission was founded in 1895 by Peter Cameron Scott, a young man whose goal was to bring the Gospel of Jesus Christ *inland* from the coast of Kenya on Africa's eastern shore all the way to Chad in central Africa. Scott and several of the original seven-member team died shortly after arriving in Africa, and others left because of poor health. After three years only one member remained. "From that seemingly hopeless beginning, God invigorated the ministry of Africa Inland Mission. He has used our missionaries to share His truth with the people of Africa through ministries as varied as agriculture, medicine, leadership development, church ministry, and many more avenues of ministry. Today African Inland Mission has more than 850 missionaries working in 15 African countries as well as the islands of the Indian Ocean. African Inland Mission's outreach

3

also extends to Africans living in the United States, Europe and Canada."[2]

Africa Inland Mission's *Mission Statement* and *Goals*, state in relevant part:

Africa Inland Mission exists to declare the Glory of God to the peoples of Africa. We exist to introduce those who have never heard to the One who died to save them – Jesus Christ. We exist to help new believers grow strong and healthy in their faith. We exist to see new believers enfolded into a maturing church. We exist to invest in the lives of current and future church leaders, so they can effectively build into the lives of others and reach out in turn to the vast populations of Africa and beyond.

While our ministries are many and varied, our two primary goals are:

1. To reach unreached peoples with the Gospel of Jesus Christ, and to plant maturing churches among those peoples.
2. To strengthen and equip the church through leadership training and development.[3]

The Complaint alleges that Plaintiff Kristina Nevius joined African Inland Mission in June 1998 to serve as a missionary under its authority, and at that time she executed a contract of employment ("Contract"). Complaint ¶10. The alleged Contract is not attached to the Complaint. In September 1999, the Plaintiff, in furtherance of her ministerial/missionary duties, was sent by African Inland Mission to serve in Namibia. Complaint ¶15. In furtherance of Plaintiff's missionary work and spiritual duties, she worked on the Mark 9:37 Mission Project, which was a spiritual home for abused, neglected, and orphaned children. Complaint ¶20. Mark 9:37 is the reference to the Gospel of Mark in the Bible, which is a quote from Jesus that reads:

---

2 Quote taken from History of African Inland Mission, which may be found at http://www.aim-us.org/about_AIM/history/history.asp

[3] African Inland Mission respectfully requests that the Court take judicial notice of African Inland Mission's Missions & Goals as enunciated and declared to the whole world on its website http://www.aim-us.org/about_AIM/mission_goals/mission.asp. If the Court is not inclined to take judicial notice, African Inland Mission is providing this information solely for the purpose of its Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction. *See Settles v. U.S. Parole Com'n*, 429 F.3d 1098, 1107 (D.C.Cir. 2005).

> Whoever welcomes one of these little children in my name welcomes me;
> and whoever welcomes me does not welcome me but the one who sent me.

Holy Bible, New International Version (1984).

After a period of time serving as a missionary in Namibia, the Plaintiff alleges that the regional director of African Inland Mission, Mick Rineer, made false accusations against the Plaintiff on April 7, 2005 regarding the Plaintiff stealing funds and abusing children who were part of her mission work. Complaint ¶¶21, 23 and 26. The Plaintiff alleges that Mr. Rineer removed her from the Mark 9:37 Mission Project and turned the property over to a local church for the church to use. Thereafter, the Plaintiff alleges that Dr. Ted Barnett, Director of Africa Inland Mission, sent her a letter on April 28, 2005, in which Dr. Barnett informed the Plaintiff that accusations had been lodged against her regarding her missionary duties and unbiblical behavior, and that the Plaintiff needed to immediately return to African Inland Mission's headquarters in New York to meet with the Director to discuss the allegations of unbiblical behavior. Complaint ¶27. Despite this request from her ecclesiastical superior, Plaintiff refused to do so and tendered her resignation, which was accepted by African Inland Mission.

Plaintiff alleges in Count I that African Inland Mission breached its contract with her by the decision to remove her from the Mark 9:37 Project and use it for other purposes. Complaint ¶¶24, 25 and 40. In Count II, Plaintiff alleges that African Inland Mission violated the District of Columbia Human Rights Act by its actions against the Plaintiff and the children she cared for in Namibia. In Count III, Plaintiff alleges that Africa Inland Mission defamed her through actions that allegedly occurred in Namibia. "On April 7, 2005, in the presence of others, Mr. Rineer falsely accused Ms. Nevius of stealing Mark 9:37 funds and abusing the children in her care." Complaint ¶¶26 and 52. In

5

Count IV, Plaintiff alleges that African Inland Mission was unjustly enriched as a result of it retaining charitable contributions that were made to it. In Count V, Plaintiff alleges a conversion by Africa Inland Mission as a result of it retaining charitable contributions made to it. In Count VI, Plaintiff alleges that she is somehow entitled to an accounting of charitable contributions that were made to Africa Inland Mission by donors.

## Legal Standard

"A motion to dismiss pursuant to Rule 12(b)(6) should not be granted 'unless it appears beyond doubt that the plaintiff can prove no set of facts in support of [her] claim which would entitle [her] to relief.'" *Sparrow v. Interbay Funding, L.L.C.*, 2006 WL 2844254, *2 (D.D.C. 2006); *quoting Radack v. U.S. Dept. of Justice,* 402 F.Supp.2d 99, 103 (D.D.C.2005). "When reviewing a motion to dismiss, the court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations." *Id.; citing Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit,* 507 U.S. 163, 164 (1993); *Egilman v. Keller & Heckman, LLP,* 401 F.Supp.2d 105, 109 (D.D.C.2005). "As such, a motion to dismiss under Rule 12(b)(6) tests not whether a plaintiff will ultimately prevail on the merits, but only whether the plaintiff has properly stated a claim for which she is entitled to relief." *Id.; citing Chandamuri v. Georgetown Univ.,* 274 F.Supp.2d 71, 76 (D.D.C.2003). "In considering a Rule 12(b)(6) motion to dismiss, the court may consider 'only the facts alleged in the complaint, any documents either attached to or incorporated in the complaint and matters of which we may take judicial notice' without converting the motion to one for summary judgment." *Hayes v. Chartered Health Plan,* 2006 WL 2983013, 2 (D.D.C. 2006); *quoting EEOC v. St. Francis Xavier Parochial Sch.,* 117 F.3d 621, 624 (D.C.Cir.1997); *see also Krooth & Altman v. North Am. Life Assur. Co.,* 134

F.Supp.2d 96, 99 (D.D.C.2001)(considering, in review of a Rule 12(b)(6) motion to dismiss, materials that were "attached to the motion to dismiss, [were] referred to in the complaint, and [were] central to [the] plaintiffs' claims"); *Cephas v. MVM, Inc.,* 403 F.Supp.2d 17, 20 (D.D.C.2005).

Unlike a Rule 12(b)(6) motion to dismiss for failure to state a claim, "[w]hen a court rules on a Rule 12(b)(1) motion, it may undertake an independent investigation to assure itself of its own subject matter jurisdiction." *Settles v. U.S. Parole Com*'n, 429 F.3d 1098, 1107 (D.C.Cir. 2005); *citing Haase v. Sessions,* 835 F.2d 902, 908 (D.C.Cir.1987) (internal quotations omitted). "This includes considering facts developed in the record beyond the complaint." *Id.* "But at the Rule 12(b)(1) stage, the plaintiff is protected from an evidentiary attack on his asserted theory by the defendant." *Id.* (internal quotations omitted).

1. **The First Amendment to the United States Constitution Deprives the Court of Subject Matter Jurisdiction**

African Inland Mission is a religious, non-profit mission agency.[4] The Preamble to African Inland Mission's Bylaws, reads:

> As a missionary organization of believers on the Lord Jesus Christ and as members of His Church, we acknowledge as our urgent duty His commission to evangelize and make disciples of all nations. Through our service, churches in sending countries have opportunity to respond in obedience to this commission and churches in receiving countries are established, edified and encouraged to reach out in like manner.

African Inland Mission's Statement of Faith & Doctrine to which all missionaries must confirm and agree to abide with, states in relevant part:

---

4 See Exhibit A, Bylaws of African Inland Mission, which is incorporated herein by reference ("Bylaws"). See also Exhibit B, Constitution of African Inland Mission, which is incorporated herein by reference ("Constitution"), Exhibit C, Charter of African Inland Mission, which is incorporated herein by reference ("Charter"), and Exhibit D, Statement of Doctrine and Faith Basis

**We believe in:**

1. The unity and trinity of God, eternally existing in three co-equal Persons, the Father, the Son, and the Holy Spirit.

2. God the Creator and Preserver of all things, who created man, male and female, in His own image, and gave them dominion over the earthly creation.

3. The deity and humanity of God the Son, the Lord Jesus Christ, who being very God, also became man, being begotten by the Holy Spirit, born of the Virgin Mary, was crucified, dead and buried, was raised bodily from the dead, and ascended to the right hand of the Father; whose two natures continue eternally and inseparably joined together in one Person.

4. The deity and personality of God the Holy Spirit, and the necessity of His work to make the death of Christ effective to the individual sinner, leading him to repentance toward God and faith in the Lord Jesus Christ; and in His ministry, dwelling permanently within and working through the believer for godly life and service.

5. The divine, verbal inspiration and infallibility and inerrancy of the Scriptures of the Old and New Testaments as originally given, and their absolute and final authority in all matters of faith and conduct.

6. The universal sinfulness and guilt of human nature since the fall, rendering man subject to God's wrath and condemnation.

7. The sacrificial death of our Representative and Substitute, the Lord Jesus Christ, the incarnate Son of God, by the shedding of whose blood atonement was made for the sins of the whole world and whereby alone men are redeemed from the guilt, penalty and power of sin.

8. The necessity of new birth as the work of God the Holy Spirit, to be obtained only be receiving the Lord Jesus Christ as Savior; that men are saved by grace through faith, not by works.

9. The security of the believer, based entirely on the atoning work of the Lord Jesus Christ, whereby, as a born-again child of God, he has assurance of salvation and has the right to all the privileges of the sons of God.

10. The responsibility of the believer to maintain good works, and to obey the revealed will of God in life and service, through which eternal rewards shall be received.

11. The True Church, whose head is the Lord Jesus Christ, and whose members are all regenerate persons united to Christ and to one another by the Holy Spirit.

12. The observance of the ordinance of Baptism and the Lord's Supper as appointed by the Lord Jesus Christ.

13. The supreme mission of the church as being to glorify God and to preach the gospel to every creature.

14. The personal and visible return of the Lord Jesus Christ.

15. The resurrection of the body.

---

signed by Plaintiff and incorporated herein.

**16.** The eternal blessedness of the saved, and the eternal punishment of the lost.[5]

The Vision Statement of African Inland Mission, to which all of its missionaries must work towards, is as follows:

**As a Christian mission agency dedicated to ministry to the peoples of Africa. AIM will declare the glory of God to the peoples of Africa through nine primary thrusts. We declare God's glory in:**

**1. PERSONAL INTEGRITY:** Who we are effects how we minister. The men and women of AIM need to challenge one another to an ever-deepening experience of God through worship, prayer, and the study of the Word.

**2. LEADERSHIP DEVELOPMENT:** The Church in Africa needs Christ-like leaders, and we seek to assist in the preparation and development of those leaders.

**3. REACHING THE UNREACHED:** So many in Africa have never heard the Good News. We seek to actively reach out to these men, women, boys and girls, and introduce them to Jesus Christ.

**4. WORLD RELIGIONS:** We seek to purposefully and compassionately share the Good News with people blinded by other world religions.

**5. WAR AND CIVIL STRIFE:** War and conflict are a daily reality for many in Africa. AIM is committed to work for and with people caught up in war and civil strife, confident in the sovereignty of God whose light shines brightest in the darkness.

**6. URBANIZATION:** African cities are mushrooming and so are the problems that accompany rapid urban growth such as poverty, disease, and crime. AIM is committed to being a light in the city, proclaiming God's truth to people of all walks of life.

**7. POVERTY AND DISEASE:** AIM is committed to demonstrating the compassion of Christ to the victims of disease, poverty, famine and violence so that they can find wholeness in Him.

**8. CHILDREN:** Over half of Africa's population is under 15 years of age. AIM is committed to presenting the claims of Christ to Africa's children by every possible means.

**9. HIV/AIDS:** Infection rates in many African countries are on the rise. Millions have died and millions continue to die. AIM seeks to declare the Gospel of hope and purity to those affected or endangered by the scourge of HIV/AIDS.[6]

At the heart of Plaintiff's Complaint is the fact that she was unhappy that the Regional Missions Director of African Inland Mission made a decision to shut down the Mark 9:37 Missions Project and allow the property to be used by a local church. Furthermore, the Plaintiff appears to be unhappy as to how the accusations of unbiblical conduct and various other decisions regarding her mission work were handled by African Inland Mission. It is clear from the Complaint that the

---

5 African Inland Mission's Statement of Faith & Doctrine can be viewed in its entirety at http://www.aim-us.org/about_AIM/doctrine/doctrine.asp

6 African Inland Mission's Vision Statement can be viewed at http://www.aim-

Plaintiff is challenging the ecclesiastical decision(s) and authority of African Inland Mission, a religious, non-profit mission agency.

The First Amendment to the United States Constitution provides, in relevant part, that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. Amend. I. These "religion clauses," referred to, respectively, as the Establishment Clause and the Free Exercise Clause, severely circumscribe the role that civil courts may play in the resolution of disputes involving religious organizations. *Presbyterian Church in the United States v. Mary Elizabeth Blue Hull Mem'l Presbyterian Church,* 393 U.S. 440, 449 (1969). Because judicial intrusion in religious disputes can advance or inhibit religion or otherwise impermissibly entangle the civil courts in ecclesiastical matters, *see Lemon v. Kurtzman,* 403 U.S. 602, 612-13 (1971), the Establishment Clause precludes civil courts from resolving disputes involving religious organizations whenever such disputes affect religious doctrine or church polity or administration, *Serbian Eastern Orthodox Diocese for the United States of America and Canada v. Milivojevich,* 426 U.S. 696, 710 (1976). The Free Exercise and Establishment Clauses of the First Amendment deprive the Court of subject matter jurisdiction over what essentially is an ecclesiastical dispute. *See Pardue v. Center City Consortium Schools of Archdiocese of Washington, Inc.,* 875 A.2d 669 (2005).

Based upon this framework of the need to show deference and not interfere with ecclesiastical disputes, the District of Columbia Circuit and many other circuits have developed the "ministerial exception" which precludes civil courts from adjudicating employment discrimination suits by ministers against the church or religious institution employing them. *E.E.O.C. v. Catholic*

---

us.org/about_AIM/mission_goals/mission.asp

*University of America*, 83 F.3d 455, 461 (D.C.Cir. 1996); *see also Minker v. Baltimore Annual Conference of the United Methodist Church,* 894 F.2d 1354, 1358 (D.C.Cir.1990) (adjudication of minister's Age Discrimination in Employment Act claim against his church would violate the Free Exercise Clause). "The ministerial exception has not been limited to members of the clergy. It has also been applied to lay employees of religious institutions whose 'primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship.'" *Id.*; *quoting Rayburn v. General Conference of Seventh-day Adventists,* 772 F.2d 1164, 1169 (4th Cir.1985). If an employee's position is important to the spiritual and pastoral mission of the religious organization, the employee is considered clergy for purposes of the ministerial exception. *Id.*

The ministerial exception is judicial shorthand for two conclusions: the first is that the imposition of secular standards on a religious employer's employment of its ministers will burden the free exercise of religion; the second, that the state's interest in eliminating employment discrimination is out-weighed by a church's constitutional right of autonomy in its own domain. *Id.* "The ministerial exception encompasses all employees of a religious institution, whether ordained or not, whose primary functions serve its spiritual and pastoral mission." *Id.* at 463.

Plaintiff in this matter was employed as a missionary by Africa Inland Mission, a religious nonprofit mission organization. As a missionary with this religious organization, Plaintiff was charged first and foremost with seeking to achieve the Mission and Goals of African Inland Mission, stated above. Thus, Plaintiff's primary duties included the teaching and spreading of the faith. She was to spread the Gospel and regularly instruct others on the Gospel and teachings of Jesus Christ. In her efforts, Plaintiff worked on Africa Inland Mission's "Mark 9:37" Project. Complaint ¶20. The

11

project focused on creating a home for orphaned children where they could be cared for and educated in Christ. As state previously, the name "Mark 9:37" itself is a reference to words spoken by Jesus Christ himself as recorded in the Holy Bible[7] wherein it reads, "Whoever receives one such child in my name receives me, and whoever receives me, receives not me but him who sent me." Plaintiff's duties as a missionary for African Inland Mission clearly fall within those of clergy, and as such, the ministerial exception is applicable. This being this case, even accepting as true for purposes of this Motion the allegations in Plaintiff's Complaint, for the Court to dive into the decisions by African Inland Mission[8] regarding the Plaintiff would require the Court to impermissibly delve into the ecclesiastical decisions of African Inland Mission and ecclesiastical decisions regarding Plaintiff's employment and the focus and nature of religious mission goals, for which this Court is deprived of subject matter jurisdiction.

In Count I (Breach of Contract), Count IV (Unjust Enrichment), Count V (Conversion), and Count VI (Breach of Trust) Plaintiff challenges the decisions of Mr. Rineer and African Inland Mission in removing her from the "Mark 9:37" Missions Project and shifting funds and resources used on this missions project elsewhere, and that these actions somehow breached a contract she had signed with African Inland Mission (Complaint ¶41); unjustly enriched African Inland Mission (Complaint ¶59); amounted to a conversion of "Project Funds" and "Support Funds" (Complaint ¶63); and breached alleged fiduciary obligations to donors (Complaint ¶68). Plaintiff alleges that as a "direct and proximate result . . . of breach of contract, [Plaintiff] has incurred significant expenses

---

7 The Reformation Bible, English Standard Version, Book of Mark, Chapter 9, Verse 37.
8 I.e., to remove the Plaintiff from the Mark 9:37 Mission Project and use the property and funds for missions with a local church, and the decision by African Inland Mission in requesting Plaintiff to return to the United States to address allegations of unbiblical behavior that was not

and losses in housing herself and the children under her care and continuing to provide for their

sustenance on a daily basis." It is clear that Plaintiff is doing nothing more than challenging the

change in missions and spiritual direction of the Mark 9:37 Missions Project by African Inland

Mission. As such, the Court lacks subject matter jurisdiction to second guess the ecclesiastical

decision by African Inland Mission and must dismiss for lack of subject matter jurisdiction Counts I,

IV, V, and VI of the Complaint.

Finally, Count II (Violation of DC Human Rights Act), this Court lacks subject matter

jurisdiction due to the ministerial exception as the Court would have to inquire, once again, into the

decision of African Inland Mission to evict Plaintiff from the Mark 9:37 Mission Project and use the

funds and resources with a local church, which are all inherently ecclesiastical in nature. *See*

*Catholic University*, 83 F.3d 455; *see also Pardue*, 875 A.2d 669. Therefore, Count II must be

dismissed for lack of subject matter jurisdiction.

### 2.    Plaintiff's Claim in Count II for Violation of the *District of Columbia Human Rights Act* Is Time Barred by the Statute of Limitations.

Count II of the Complaint alleges that there has been a violation of the *District of Columbia*

*Human Rights Act* (the "Act"). Complaint ¶¶45-50. Plaintiff claims that Africa Inland Mission

"wrongfully discharged Ms. Nevius, either expressly or constructively, and upon information and

belief, treated other, similarly qualified employees that belonged to a non-protected class, differently

than Ms. Nevius." The alleged acts that Defendant complains of in her complaint all occurred well

more than one year prior to the filing of this action. Complaint ¶¶21-38.

*D.C.Code* §2-1403.16(a)(2001) states in pertinent part that, "A private cause of action

---

in accordance with the religious mission and goals of African Inland Mission.

pursuant to this chapter shall be filed within one year of the unlawful discriminatory act, or the

discovery thereof." The District of Columbia Court of Appeals again makes this clear in stating that,

"Complaints alleging violations of the Act must be filed 'within 1 year of the occurrence of the

unlawful discriminatory practice, or the discovery thereof....'" *Hancock v. The Bureau of National*

*Affairs, Inc.,* 645 A.2d 588, 589 (1994); *quoting D.C.Code* §1-2544(a). As the alleged

discriminatory events complained of in this action occurred more than one year prior to the filing of

this action, Plaintiff's claims of violation of the Act in Count II of the Complaint are time-barred and

must be dismissed for failure to state a claim.

3. **Count II (Violation of the DC Human Rights Act) Should be Dismissed as the All Alleged Discriminatory Acts Complained of Occurred Outside of the District of Columbia.**

In Count II of the Complaint, Plaintiff seeks an amount in excess of $100,000.00 for

compensatory damages arising out of an alleged violation of the Act. Plaintiff's Complaint contains

no allegation that she was employed in the District of Columbia, nor that any of the alleged

discriminatory acts occurred within the District of Columbia. As stated in the Complaint, Africa

Inland Mission is "a corporation registered in the State of New York." Complaint ¶6. The only

claimed nexus with the District of Columbia is contained in Paragraph 7 of the Complaint wherein

Plaintiff alleges that, "AIM-International and /or AIM-US recruit missionaries throughout the United

States and have recruited missionaries, such as Ms. Nevius, from the District of Columbia on a

regular basis through telephone, mail, and through sending recruiters and/or other representatives to

the District of Columbia." Plaintiff makes no allegation that she was employed in the District of

Columbia, or that she performs any work within the District of Columbia on behalf of any alleged

employer. All allegations contained in the Complaint relating to any and all alleged violations of the

14

Act are allegations of actions occurring entirely outside of the District of Columbia, and in fact, entirely outside of the United States.

The Council of the District of Columbia made expressly clear its intent in enacting the Act, stating in §2-1401.01:

> It is the intent of the Council of the District of Columbia, in enacting this chapter, to secure an end *in the District of Columbia* to discrimination for any reason other than that of individual merit, including, but not limited to, discrimination by reason of race, color, religion, national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity or expression, familial status, family responsibilities, matriculation, political affiliation, genetic information, disability, source of income, and place of residence or business. (emphasis added)

*D.C.Code* § 2-1403.16(a) (2001) states in pertinent part that, "Any person claiming to be aggrieved by an unlawful discriminatory practice shall have a cause of action in any court of competent jurisdiction for damages…" The most important factor in determining whether the Court has subject matter jurisdiction is where the alleged violations of the Act occurred. *Matthews v. Automated Business Systems & Services, Inc.,* 558 A.2d 1175 (D.C.1989). This Court confirmed the ruling in *Matthews* stating that, "[t]he ruling in *Matthews* establishes that the most important factor in determining whether a court has subject matter jurisdiction over a claim filed pursuant to the DCHRA [the Act] is not whether the plaintiff was actually employed in the District of Columbia but whether the alleged discriminatory acts occurred in the District." *Quarles v. General Investment and Development Co., et. al,* 260 F.Supp 2d 1, at 20 (2003) citing *Id.* at 1180.

Plaintiff seems to contend that if an employer recruits individuals from the District of Columbia for employment within another state, or for employment entirely outside of the United States, this somehow allows for the application of the Act to the recruiting employer and subjects the employer to this Court's personal jurisdiction. There is no application of the Act to such employers.

15

It is clear that the Plaintiff has failed to state a claim upon which relief may be granted.

### 4.    Plaintiff's Claim in Count III for Defamation is Time Barred.

In Count III, Plaintiff alleges that Africa Inland Mission defamed her through actions that she alleges occurred in Namibia. Plaintiff alleges that, "on April 7, 2005, in the presence of others, Mr. Rineer falsely accused Ms. Nevius of stealing Mark 9:37 funds and abusing the children in her care." Complaint ¶¶ 26 and 52. This is the only allegation of publication to third parties in the Complaint. All allegations contained in the Complaint refer to alleged actions that occurred more than one year prior to Plaintiffs filing of her Complaint.

"Under District of Columbia law, a one-year statute of limitations applies to libel and slander claims." *Thompson v. Jasas Corporation, et al.,* 212 F.Supp.2d 21, at 6, citing *D.C.Code* § 12-301(4) which provides a one year statute of limitations from the time the right to maintain an action accrues for defamation.[9] As the actions complained of occurred more than one year prior to Plaintiff commencing this action, Plaintiff's claim of Defamation in Count III of the Complaint is time barred and must be dismissed for failure to state a claim.

### 5.    Plaintiff Fails to State a Claim for Unjust Enrichment in Count IV as Plaintiff Alleges that there is a Contract Between Plaintiff and African Inland Mission

"Unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust." *News World Communications, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005). "A claim for unjust enrichment accrues only when the enrichment actually becomes

---

9  If the Court were to determine that the laws of New York applied, "the statute of limitations applicable to defamation claims is one year (CPLR 215[3] ), and generally accrues on the date of the first publication." *Hoesten v. Best,* 821 N.Y.S.2d 40, 45 (N.Y.A.D. 1 Dept.,2006).

unlawful." *Id.* at 1225 (quoting, *T.E.A.M. Entm't Inc. v. Douglas,* 361 F.Supp.2d 362, 369 (S.D.N.Y. 2005). However, "there can be no claim for unjust enrichment when an express contract exists between the parties." *Schiff v. American Ass'n of Retired Persons,* 697 A.2d 1193, 1194 (D.C. 1997)(*citing Bloomgarden v. Coyer,* 479 F.2d 201, 210 (D.C. Cir. 1973)("in order to claim a remedy for unjust enrichment, there must be no contract either express or implied").

Here, Plaintiff's claim for unjust enrichment fails for two reasons: (1) the plaintiff has not conferred a benefit on the defendant, rather the benefit was conferred by third-parties making charitable donations to African Inland Mission (Complaint ¶11); and (2) the Plaintiff alleges that there is a contract between the parties in Count I and in Paragraphs 8, 10, 11, and 40-44, which has been breached and claims the same relief in Count IV (Unjust Enrichment) as in Count I (Breach of Contract). Therefore, Plaintiff fails to state a claim upon which relief can be granted as to Count IV (Unjust Enrichment).

### 6. Plaintiff has Failed to Plead the Requisite Elements for a Claim of Conversion in Count V

"Conversion has generally been defined as any unlawful exercise of ownership, dominion or control over the personal property of another in denial or repudiation of his rights thereto. And where the defendant's initial possession is lawful, the settled rule is that in the absence of other facts and circumstances independently establishing conversion, a demand for its return is necessary to render his possession unlawful and to show its adverse nature." *Shea v. Fridley,* 123 A.2d 358, 361 (D.C. 1956); *see Shehyn v. District of Columbia,* 392 A.2d 1008, 1012 (D.C.1978)("The essence of a conversion is a wrongful taking or a wrongful retention of property after a rightful possession").

Here, the Complaint fails to allege that Plaintiff or any donors have made a demand for the

17

return of the items alleged to be held by African Inland Mission in unlawful possession. As the Court in *Shea* makes clear, the failure to plead and allege proof of a demand for the return of the converted property is fatal, and the Court has no choice but to rule that Plaintiff has failed to plead the necessary elements of conversion against African Inland Mission. *Shea*, 123 A.2d at 361 ("In her complaint plaintiff simply alleged a lease of the property to Miller and her subsequent conversion of the furnishings. Nowhere is there any allegation or proof of a demand for their return, nor a showing of other facts sufficient to establish a conversion independent of any demand. That being so, we have no choice but to rule that plaintiff [] failed to make out a case of conversion against [the defendant][]"). Therefore, the Court should dismiss Count V (Conversion) for failure to state a claim upon which relief can be granted.

7.    **Plaintiff's Claim in Count I (Breach of Contract), Count IV (Unjust Enrichment), Count V (Conversion), and Count VI (Breach of Trust and Demand for Accounting), Must be Dismissed as Plaintiff Has Failed to Join Necessary and Indispensable Parties.**

Under Rule 19(a) of the Federal Rules of Civil Procedure:

> A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. If the person has not been so joined, the court shall order that the person be made a party. If the person should join as a plaintiff but refuses to do so, the person may be made a defendant, or, in a proper case, an involuntary plaintiff. If the joined party objects to venue and joinder of that party would render the venue of the action improper, that party shall be dismissed from the action.

"A party is indispensable or unconditionally necessary, so that an action must be dismissed if it is not joined, if it has an interest in the proceeding which is not distinct and severable, if a final decree cannot be made in the party's absence without having an injurious effect on that interest, if the Court

18

cannot do complete and final justice without affecting the party's interest, or if the final determination of the controversy in the party's absence will be inconsistent with equity and good conscience." *Alaska Freight Lines v. Weeks,* 18 F.R.D. 64, 65 (D.D.C. 1955).

Counts I, IV, V and VI of Plaintiff's Complaint all rely upon a claim by Plaintiff that she holds an interest in "charitable contributions," all of which she agrees were "donated to" Africa Inland Mission. Complaint ¶9. Africa Inland Mission as a religious nonprofit mission organization is exempt from Federal income tax [10] pursuant to Section 501(c)(3) of the Internal Revenue Code of 1954 (the "Code"). Contributions to it are deductible since it is an organization described in section 170(c)(2) of the Code.

Plaintiff was a Missionary for Africa Inland Mission. As alleged in the Complaint, during her term of serving as a missionary for Africa Inland Mission, individuals made charitable contributions to Africa Inland Mission with a wish that those funds be used in support of Plaintiff as a Missionary employed with Africa Inland Mission and projects of Africa Inland Mission on which Plaintiff may have worked. As required by the Code, at all times these contributions were under the complete control of Africa Inland Mission. No express or implied restriction was placed upon any contribution to Africa Inland Mission whereby any form of trust was created with the Plaintiff or any specific project undertaken by Africa Inland Mission being the intended beneficiary thereunder. *See Davis v. United States,* 495 U.S. 472 (1990).

Plaintiff now claims that tax deductible charitable contributions of donors that were made directly to Africa Inland Mission were intended as gifts to the Plaintiff and that African Inland

---

[10] African Inland Mission respectfully requests that the Court take judicial notice of its status as a tax-exempt nonprofit organization.

Mission was merely a conduit for donors to receive tax deductions. Plaintiff is asking this Court to rule that these tax deductible contributions that were made directly to Africa Inland Mission, and for which Africa Inland Mission issued the contributing individuals a receipt as proof of tax deductibility, were in fact gifts to the Plaintiff, and that none of the donors intended their contributions as charitable tax deductible contribution to Africa Inland Mission. *See Peace v. Commissioner of Internal Revenue,* 43 TC 1 (1964); *see also Davis*, 495 U.S. at 478 (1990). This being the case, all of the individuals that contributed funds to America Inland Mission with a wish to support Plaintiff as a Missionary of Africa Inland Mission, and/or other projects of Africa Inland Mission that Plaintiff may have been involved with as an employee of Africa Inland Mission, would lose their tax deductions that they have and/or will take for their contributions to Africa Inland Mission since as early as 1998, this being the Plaintiff's first year of employment with Africa Inland Mission as a Missionary.

All of the individuals that made charitable tax deductible contributions to Africa Inland Mission with a wish to support Plaintiff and/or other projects of Africa Inland Mission that Plaintiff may have been involved with during her employment as a Missionary, specifically the project Plaintiff refers to as "Mark 9:37," and who were provided with receipts indicating the deductibility of the same, would lose this deductibility. In addition, they would lose the deductibility of all contributions that they have in all likelihood already indicated on their tax returns that have been filed with the Internal Revenue Service since as early as 1998 as deductible. This could subject these individuals to penalties and interest for any deductions claimed as a result of their charitable contributions to Africa Inland Mission that Plaintiff now claims were actually gifts to her.

The interest of these donors to Africa Inland Mission is not distinct and severable, a final

decree cannot be made in the absence of the contributors without having an injurious effect on their

interest, the Court cannot do complete and final justice without affecting the contributors' interests,

and the final determination of the controversy in absence of the contributors will be inconsistent with

equity and good conscience.  Clearly, Plaintiff has failed to join necessary and indispensable parties,

and as such, this matter must be dismissed in their absence.

> **8.**    **Plaintiff's Claim in Count I for Breach of Contract, Count IV for Unjust Enrichment, Count V for Conversion, and Count VI for Breach of Trust and Demand for Accounting, Must be Dismissed as Plaintiff Has Failed to State a Claim Upon Which Relief Can be Granted.**

Plaintiff claims now that that she is no longer employed by Africa Inland Mission, and she is

entitled to receive directly all tax deductible contributions that she may have assisted in raising, but

that she agrees were donated to Africa Inland Mission.  Complaint ¶9.  Her contention for this is that

she was involved with raising these funds while an employee of Africa Inland Mission.

According to the Complaint, missionaries of Africa Inland Mission are required, as a

condition of employment, to raise funds to support the efforts of Africa Inland Mission.  No funds

donated to Africa Inland Mission at any time have carried with them a commitment or understanding

that they would be used only to support Plaintiff or that African Inland Mission was merely a

conduit.  The Code requires and makes clear that African Inland Mission must have complete

discretion and control over all funds received from any and all individuals that in any way indicate a

wish that the funds be used to help support an individual missionary. *Davis v. United States*, 495

U.S. 472, 478 (1990).  Such tax deductible contributions are made regularly to organizations such as

Africa Inland Mission to help support missionaries and such practices have for years been recognized

by the Courts as creating tax deductible contributions to the organization and not as creating gifts to

21

the missionary. *Id.*; *see also Peace,* 43 TC 1 (1964).

In her Complaint, Plaintiff clearly acknowledges that all funds of which she may have had a hand in raising for Africa Inland Mission were in fact "donated to" Africa Inland Mission. Complaint ¶9. As such, it is impossible for Plaintiff to prove any set of facts which would entitle her to the relief of receiving any funds from Africa Inland Mission that were made as tax deductible contributions and "donated to" Africa Inland Mission. Consequently, Counts I, IV, V, and VI of Plaintiff's Complaint must be dismissed for failure to state a claim upon which relief can be granted.

### 9.    Plaintiff Fails to State a Claim for Breach of Trust as Section 170 of the Internal Revenue Code Does Not allow a Trust to be Created For Her Personal Benefit.

In *Davis*, the Court reviewed a claim made by a donor of a series of alleged charitable contributions to a church mission organization that was used to support their two sons while they conducted a short term mission project. *Davis*, 495 U.S. at 474. The Court held a donation to a tax-exempt entity does not create a fiduciary relationship in general or allow the donor the ability to supervise the use of the contributed funds. *Id.* at 484-85. The Court reasoned that "Under Section 170 of the Code, a taxpayer may claim a deduction for a charitable contribution only if the contribution is made "to or for the use of" a qualified organization.   This section provides, in pertinent part:

"(a) Allowance of deduction.
"(1) General rule.-There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year. A charitable contribution shall be allowable as a deduction only if verified under regulations prescribed by the Secretary.
.   .   .   .   .   .
"(c) Charitable contribution defined.-For purposes of this section, the term 'charitable contribution' means a contribution or gift *to or for the use of*-
.   .   .   .   .   .
"(2) A corporation, trust, or community chest, fund, or foundation-

. . . . .

"(B) organized and operated exclusively for religious, charitable, scientific, literary, or educational purposes...." (Emphasis added.)"

*Davis*, 495 U.S. at 478 (quoting Section 170 of the Internal Revenue Code).

If funds are donated to a tax-exempt organization to be held in trust for the personal use of a third party, such donations are not tax-exempt donations, as the tax-exempt organization is not exercising dominion and control over the donations. *See Id.* at 485-86. In short, a trust for the personal benefit of a third party, such as Plaintiff, is not created by a charitable donation to an entity. *Id.*

Here, the Complaint states that a trust was created for her personal benefit by charitable donations made to African Inland Mission. As the *Davis* case makes clear, this is a legal impossibility and would be in violation of Section 170 of the Code. As no trust was created by the charitable donations for Plaintiff's personal benefit, there can be no breach of trust as stated in Count VI of the Complaint, and Plaintiff has no standing to request an accounting of charitable donations made to African Inland Mission.

### Conclusion

For the reasons stated herein and as may otherwise be argued at a hearing or further written submission to this Honorable Court, all of the individual Counts of Plaintiff's Complaint should be dismissed with prejudice as against the Defendant Africa Inland Mission International, Inc.

Respectfully Submitted,
Africa Inland Mission International, Inc.
By counsel

23

**GAMMON & GRANGE, P.C.**

Timothy R. Obitts, Esq., DC Bar#478470
Gammon & Grange, P.C.
8280 Greensboro Drive, 7th Flr.
McLean, Virginia 22102
(703) 761-5000
(703) 761-5023 -facsimile-

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on the 15th day of December, 2006, a true and accurate copy of the foregoing was served by U.S. first class mail, postage prepaid, to the following:

Robert N. Kelly, Esq.
James B. Travis, Esq.
1120 Twentieth Street, NW
South Tower
Washington, DC 20036-3437

Timothy R. Obitts, Esq.

### BY-LAWS
*of*
### AFRICA INLAND MISSION INTERNATIONAL, INC.
### U.S. SENDING COUNCIL

#### *Section I -- Preamble*

As a missionary organization of believers on the Lord Jesus Christ and as members of His Church, we acknowledge as our urgent duty His commission to evangelize and make disciples of all nations. Through our service, churches in sending countries have opportunity to respond in obedience to this commission and churches in receiving countries are established, edified and encouraged to reach out in like manner.

#### *Section II -- Name*

The name of this organization shall be AFRICA INLAND MISSION INTERNATIONAL, Inc., hereafter referred to as the U.S. Council or AIM in these By-laws.

#### *Section III -- Purpose*

The purpose of this organization shall be to obey the divine commission as stated by our Lord in Matthew 28:19,20:

> Therefore go and make disciples of all nations, baptizing them in the name of the Father and of the Son and of the Holy Spirit, and teaching them to obey everything I have commanded you. And surely I will be with you always, to the very end of the age.

The U.S. Sending Council shall exercise the authority of the organization within its geographic area of ministry. It shall conduct its business in accordance with the policies of the International Council and subject to the legislation of the country concerned. Its responsibilities within its geographic areas shall include:

A.    Representing the organization to supporting constituencies and informing them of needs and opportunities;
B.    Procuring personnel, finances and other resources;
C.    Appointment and care and discipline of members of Africa Inland Mission International
D.    Conducting ministries;
E.    Dismissal of members.

#### *Section IV -- Membership*

Categories

A.    Full Members:
Those appointed as missionaries by the U.S. Council to serve for four years or more.

3/99

EXHIBIT

A

B.    U.S. Council Members:
Those chosen by vote of the U.S. Council (otherwise referred to as the Board of Trustees) to serve as Trustees for three-year terms.

C.    Associate Members
    1.    **Short Term**
    Those who have taken up assignment for period exceeding one year but less than four years.
    2.    **Volunteers**
    Those who have taken up assignment with AIM International for less than one year.
    3.    **Seconded**
    Members of other Christian organizations who are seconded to Africa Inland Mission International.
    4.    **Temporary**
    Those who have been temporarily accepted by a branch or board and the International Directorate, pending acceptance by the U.S. Council.
    5.    **Affiliate**
    Those who are appointed to serve in the United States without remuneration.

D.    Retired Members
Full members who have reached retirement age as specified by the By-Laws and who have been granted retirement status by the U.S. Sending Council.

E.    Member Appointee
Those who are accepted by the U.S. Sending Council but have not yet taken up assignment.

Secondment
Secondment of members to other organizations and churches shall be by means of a secondment agreement.

### *Section V -- Officers*

The officers of the Board of Trustees of the U.S. Council shall be a **President, Vice-President, Secretary, Treasurer, and U.S. Director**. Except for the latter, each shall be elected annually by the Trustees from their own number. One person may hold more than one of these offices.

1.    The duties of the **President** shall be those usually pertaining to this office. He shall be chairman of the Board of Trustees at its meetings. Moreover, the President shall be especially charged with the duty of maintaining the principles of the Mission set forth in its doctrinal basis as stated in the Constitution.

2.    The duties of the **Vice President** shall be to fill the place of the President and to perform all of his duties in his absence.

3.    The duties of the **Secretary** shall be to record the minutes of the Trustee meetings and to care for official correspondence as directed by the Trustees.

3/99

4.     The **Treasurer** is ultimately responsible to the Trustees of the U.S. Sending Council for all accounts of the Corporation, receipt for all monies received, and the disbursement of all funds in accordance with the instructions of the Trustees, the I.C. Constitution and By-Laws and the wishes of the donor as it complies with AIM documents. The Treasurer is ultimately responsible for financial reports made to the Trustees at their regular meetings of the financial condition of the Corporation, showing the receipts and disbursements for the preceding months, the balances in banks and other financial institutions, and the presentation of the revenue and expense budgets. The Treasurer is ultimately responsible for the report to the Annual Meeting of the Trustees showing the financial condition of the Corporation, its receipts and disbursements, its balances in various funds or accounts, the deposits in banks and other financial institutions and cash on hand. The Treasurer shall be ultimately responsible to make sure information is secured in advance regarding the funds that are anticipated to be needed for the different divisions of the Mission, separately:

   a.     for the maintenance and improvement of existing phases of activity and

   b.     for the promotion, initiation and maintenance of new phases.

   The Treasurer is ultimately responsible to insure funds are deposited in banks and financial institutions designated for the purpose by the Corporation.

5.     The **U.S. Director** shall be nominated by the Board of Trustees to administer the work of the Board. This nomination shall be ratified by affirmative vote by a majority of the members sent by that Board and eligible to vote. After ratification, he shall be appointed for a term of four years. Any further terms shall fulfill the requirements of the initial appointment. He shall be an ex-officio, voting member of that Board.

### *Section VI -- Meetings and Elections*

The following shall be the Order of Business at the meetings of the Corporation:

   1.    Order of Business

      a.     Devotions
      b.     Reports of officers
      c.     Committee Reports
      d.     Old Business
      e.     New Business
      f.     Adjournment with Prayer

   2.    Frequency of Meetings

      Regular Meetings of the Board of Trustees shall be held at least four times a year. Special meetings of the Trustees may be called by the chairman or the U.S. Director. Members shall be notified of such meetings at least one week prior to the meeting.

3/99

3.    Nominations

The Nominating Committee shall submit nominations for Trustees to the annual meeting. Independent nominations may be submitted in writing to the Nominating Committee by members of the U.S. Council.

4.    Elections

a.    There shall be three classes of up to five voting members each, but not less than three members each.
b.    A majority vote of those present at the Annual Meeting (or any regular meeting to replace a resigning member) shall be necessary to elect.
c.    Members shall be elected in successive years, and may be re-elected.
d.    The U.S. Council may invite a retired Council member to continue attending U.S. Council meetings in a non-voting capacity. This appointment may be renewed annually.

5.    Quorum

A quorum shall consist of more than 50% of the members of the Board of Trustees. A majority vote of those present at a meeting shall determine any decision.

6.    Minutes of Meetings

Minutes of the meetings of the Board of Trustees shall be provided to:
a.    Each member of the Board;
b.    The International Office of AIM;
c.    Each Sending Council, Branch Office and Board of the Mission.

### Section VII -- Standing Committees

The following Standing Committees shall be appointed by the Trustees from their own number:

1.    Executive Committee
2.    Finance Committee/Audit Committee
3.    Personnel Advisory Committee
4.    Retirement Committee
5.    Pension Fund Trustees
6.    Investment Committee
7.    Nominating Committee

The U.S. Council may appoint other committees to oversee aspects of ministry at its discretion.

3/99

The duties and responsibilities of the Standing Committees (except that the Board of Trustees may elect to consider any matter falling in the province of a Committee without referring it to the Committee except for matters which by law remain with the pension fund trustees.):

1.  Executive Committee

    The Executive Committee consists of officers of the U.S. Council and the U.S. Director and shall consider and make decisions between Council meetings subject to approval of the U.S. Council.

2.  Finance/Audit Committee

    The Finance/Audit Committee shall deal with or make appropriate recommendations to the Council concerning matters relating to the finances of AIM including financial policy, receipts, disbursements, budget and financial needs.  It shall recommend the appointment of the official auditors of the financial records of the organization to the U.S. Council, shall review the Report of the Auditors, and shall make such recommendations to the U.S. Council as it deems necessary.  It shall receive and study financial reports from the Finance Department and ensure that mission funds have been used in a manner consistent with the goals and objectives of the mission.

3.  Personnel Advisory Committee

    The Personnel Advisory Committee shall receive copies of all application papers for membership in the Mission and shall inform the Candidate Department of any concerns or questions stemming from those applications.

4.  Retirement Committee

    The Retirement Committee shall deal with or make appropriate recommendations to the U.S. Council concerning matters relating to the retirement program, including the Retirement Center in Florida, and those affecting missionary retirees.

5.  Pension Fund Trustees

    The Pension Fund Trustees shall oversee the management,  investment, purchase and sale of all AIM pension assets being responsible to see that they are invested in the most productive way possible commensurate with AIM's investment policy and within appropriate levels of risk.

6.  Investment Committee

> The Investment Committee shall oversee and make decisions (subject to the U.S. Council approval) relating to the investment, sale, and placement of all AIM trust funds.

7.  Nominating Committee

> The Nominating Committee shall recommend to the U.S. Council individuals for election as Council members. It shall annually recommend Council committees and class appointments.

## *Section VIII -- Financial Policies*

1.  All gifts for the ministry of AIM shall be **receipted** and used as far as possible in the manner designated by the donor, in light of goals and objectives of the organization, and all applicable legal requirements.

2.  All accounts shall be subject to an **annual audit** by a qualified outside auditor appointed by the U.S. Council. Statements of the auditors shall be sent to all Sending Councils, Branches and Boards and shall be made available to the public upon request.

3.  As a government recognized 501(c)(3) **non-profit corporation**, no Mission funds may anure to the profit of any individual. All U.S. Council members, AIM missionary members and employees must sign AIM's Conflict of Interest Policy.

4.  No unsecured "outside" debts shall be incurred in the operation of the Mission.

5.  Recognizing that the entire Christian life is a walk of faith, this organization and its members depend upon God as the ultimate provider of every need, spiritual and material. Members can thus be freed from concern for personal needs and are enabled to seek the welfare of others.

> While looking to the Lord in faith to supply all needs, information may be shared appropriately in such a way to honor the Name of the Lord and to foster faithfulness in stewardship.

6.  The fiscal year of the Corporation shall close on the last day of December.

7.  The Finance Committee will submit a revenue and expense budget to cover all aspects of the U.S. Council's ministries and operation. The budget for the next fiscal year shall be recommended by the Finance Committee annually, and adopted by the U.S. Council by the end of December annually.

> No payment shall be made from AIM International funds except in accordance with the directions of the U.S. Council.

3/99

8.    The U.S. Council recommends to the International Council Finance Committee the target support rate for all AIM missionaries serving in the United States. The U.S. Council Executive Committee approves the compensation of the U.S. Director and also the salary scales for all employees of the U.S. Council.

## Section IX -- Discipline

Any trustee, member, missionary, or other worker of the Mission who is found not believing the principles set forth in the doctrinal basis of the Mission, shall upon the decision of the U.S. Council cease to have any relationship to the Mission. The individual shall have the right to appear before the U.S. Council Executive Committee.

Any trustee, member, missionary, or other worker of the Mission who has been found guilty of conduct that, in the judgment of the U.S. Council or its Executive Committee, would unjustly mitigate against the standing of, or confidence in, the Mission, may be disciplined by suspension, probation, dismissal, or otherwise as may in the judgement of the U.S. Council Executive Committee seem best. Such an individual has the right of appeal to the U.S. Council Executive Committee whose decision shall be final.

## Section X -- Amendments

Amendments may be made to these By-laws upon 30 days written notice by a vote of the majority of the U.S. Council present at any regular or special meeting subject to the policies of the International Council as set out in its Constitution and By-laws.

3/99

# APPROVED
## AIM International Constitution as Proposed by IC 2005

### PREAMBLE

This constitution defines the parameters for the beneficial cooperation of separate legal entities that have committed to work together under Africa Inland Mission International.

### ARTICLE I - NAME

The name of this organization shall be **Africa Inland Mission International** hereafter referred to as AIM International.

### ARTICLE II - PURPOSE

This mission organization serves the church of Jesus Christ in its responsibility to make disciples of the peoples of Africa as stated in Matthew 28:19-20:

> "Therefore go and make disciples of all nations, baptizing them in the name of the Father and of the Son and of the Holy Spirit, and teaching them to obey everything I have commanded you. And surely I am with you always, to the very end of the age."

### ARTICLE III - DOCTRINE

The members of this organization declare their belief in:

**Section 1**
The unity and trinity of God, eternally existing in three co-equal Persons: the Father, the Son and the Holy Spirit.

**Section 2**
God the Creator and Preserver of all things, who created man, male and female, in His own image, and gave them dominion over the earthly creation.

**Section 3**
The deity and humanity of God the Son, the Lord Jesus Christ, who, being very God, also became man, being begotten by the Holy Spirit, born of the Virgin Mary, was crucified, dead and buried, was raised bodily from the dead, and ascended to the right hand of the Father, whose two natures continue eternally and inseparably joined together in one Person.

**Section 4**
The deity and personality of God the Holy Spirit, and the necessity of His work to make the death of Christ effective to the individual sinner, leading him to repentance toward God and faith in the Lord Jesus Christ; and in His ministry, dwelling permanently within and working through the believer for godly life and service.

**Section 5**
The divine, verbal inspiration, infallibility and inerrancy of the Scriptures of the Old and New Testaments as originally given, and their absolute and final authority in all matters of faith and conduct.

**Section 6**
The universal sinfulness and guilt of human nature since the fall, rendering man subject to God's wrath and condemnation.

**Section 7**
The sacrificial death of our Representative and Substitute, the Lord Jesus Christ, the incarnate Son of God, by the shedding of whose blood atonement was made for the sins of the whole world and whereby alone men are redeemed from the guilt, penalty and power of sin.


EXHIBIT
B

**Section 8**
> The necessity of the new birth as the work of God the Holy Spirit, to be obtained only by receiving the Lord Jesus Christ as Saviour; that men are saved by grace through faith, not by works.

**Section 9**
> The eternal blessedness of the saved and the eternal punishment of the lost.

**Section 10**
> The security of the believer, based entirely on the atoning work of the Lord Jesus Christ, whereby, as a born-again child of God, he has assurance of salvation and has the right to all the privileges of the sons of God.

**Section 11**
> The responsibility of the believer to maintain good works, and to obey the revealed will of God in life and service, through which eternal rewards shall be received.

**Section 12**
> The True Church, whose Head is the Lord Jesus Christ, and whose members are all regenerate persons united to Christ and to one another by the Holy Spirit.

**Section 13**
> The observance of the ordinances of Baptism and the Lord's Supper as appointed by the Lord Jesus Christ.

**Section 14**
> The supreme mission of the Church as being to glorify God and to preach the gospel to every creature.

**Section 15**
> The personal and visible return of the Lord Jesus Christ.

**Section 16**
> The resurrection of the body.

## ARTICLE IV - MEMBERSHIP

### Section 1 Admission to Membership

All applicants accepted by an AIM International mobilizing region gain admission to AIM International. Additionally, AIM International may receive members from other like-minded organizations through an approved secondment agreement with either a mobilizing or receiving region.

### Section 2 Categories

**A. Full Member**
> Those who have taken up assignment with AIM International for a period of one year or more

**B. Appointee Member**
> Those who have been accepted by a mobilizing region but have not yet taken up assignment

**C. Short Term Member**
> Those who have taken up assignment with AIM International for less than one year

**D. Mobilizing Council Member**
> Those who are appointed to serve on a mobilizing council

**E. Retired Member**
> Those who have been granted retirement status by their mobilizing region

**F. Affiliate Member**
> Those who are appointed to serve in a mobilizing region without remuneration or voting privileges

### Section 3 Rights and Privileges

**A. Voting**
> For any change of this constitution or for the ratification of officers, the following members may vote:

2

1. **Full Members**
   After one year of ministry. Those on home assignment may vote for up to two years after leaving their ministry assignment
2. **Mobilizing Council Members**
   After one year of membership on the council
3. **Retired Members**
   May vote for two years after achieving retirement status

B. **Holding Office:** The offices of AIM International shall be defined in the AIM International Policy Manual. Members are eligible to hold office as defined in the AIM International Policy Manual.

**Section 4 Termination of Membership**
   Termination from membership in AIM International shall be the responsibility of the region that was responsible for acceptance.

## ARTICLE V - INTERNATIONAL COUNCIL

**Section 1 – Purpose**
   As the highest authoritative body of AIM International, the International Council directs the ministry of the Mission.

**Section 2 – Function**
   A. The International Council shall define and evaluate the vision, long-range goals, and effectiveness of AIM International
   B. The International Council shall direct the appointment process of the International Director.
   C. The International Council shall monitor and evaluate the ministry of the International Director
   D. The International Council shall establish and evaluate the ministry of the mobilizing and receiving regions through the International Director
   E. The International Council shall promote unity within AIM International
   F. The International Council shall establish, modify, and maintain its policies

**Section 3 - Composition**
   A, The executive officers of the mobilizing and receiving regions, or their International Council approved alternate.
   B. The International Director – with voting privileges
   C. The International Council Chairman
   D. The International Council shall appoint two non-executive AIM International members whose term shall be specified by the International Council.
   E. The International Council is free to invite non-voting participants
   F. The International Council has the authority to establish a limiting schedule of delegates should they deem the size of the council to be a hindrance.

**Section 4 - Meetings**
   A. Frequency - The International Council shall meet at least annually.
   B. Quorum - A quorum shall consist of three-fourths of the International Council voting members.
   C. Special Meetings - The International Council can be convened at any time for a special meeting by the International Director with the approval of any three members of the International Council. The International Director shall call a meeting if requested by 50% of the International Council members.
   D. Voting - Each voting member present shall be eligible to cast one vote on any issue and a majority of affirmative votes shall be effective. The Chairman shall cast the deciding vote in the case of a tie.

**Section 5 - Officers**

    A. Chairman - The chairman shall be selected by the International Council from the membership of AIM International. The chairman shall serve a minimum of two years. The chairman shall not vote, except in the case of a tie.

    B. International Director

        1. The International Director shall be the chief executive officer of the International Council.

        2. The International Director shall be appointed by the International Council and ratified by a majority of affirmative votes of the ballots cast by eligible members of AIM International.

        3. A term of service shall be four years.

        4. The International Director shall not serve more than three consecutive terms.

        5. The International Director shall have the authority to appoint associate directors.

    C. Deputy International Director - shall be appointed by the International Council at each regular meeting and will assume the duties of the International Director in the event of his incapacitation. The Deputy shall serve until the International Director is able to resume office. In the case of the permanent incapacitation, or removal from office of the International Director, the Deputy shall serve until the next International Director takes office.

**Section 6 - Removal of Officers**

    The officers of the International Council may be removed from office by a two-thirds majority vote of the members of the International Council

**ARTICLE VI MOBILIZING REGIONS**

**Section 1 - Purpose**

A mobilizing region shall exist to implement the purpose of this organization primarily through the procurement of prayer, personnel, and resources

**Section 2 – Function**

    A. Implement International Council decisions and consistently apply its policies

    B. Appoint and dismiss members

    C. Inform, challenge and conduct ministries which assist the church in responding to the divine commission
as it relates to the peoples of Africa.

    D. Provide member care, direction, and discipline for those under its jurisdiction

    E. Ensure that the legal requirements necessary for AIM International to function in its specific area are met, including, but not limited to, the formation of a governing body

    F. Provide representation to International Council for the members through their executive officer

**Section 3 - Establishment**

International Council may establish a mobilizing region in a defined area when it judges that the appropriate conditions have been met to fulfill the purpose of the mission.

**Section 4 - Executive Officer**

An executive officer shall be appointed by each mobilizing governing body with the responsibility to direct the work of that region. This appointment shall be ratified by an affirmative vote of the majority of the ballots cast by members eligible to vote from that region. He shall serve a four year term and be eligible for reappointment for further terms. He shall be an ex -officio, voting member of that governing body. The executive officer shall also be accountable to the International Director for compliance with International Council decisions and for evaluation of the strategic ministry of his region.

**Section 5 - Dissolution**
International Council may revoke the mobilizing region status from any mobilizing region or reduce it to that of a committee answerable to the International Council or to another mobilizing region. The dissolution of a mobilizing region would be the decision of the mobilizing council and would be carried out under their policies meeting the legal requirements in their area and the objectives of AIM International.

**Article VII RECEIVING REGIONS**

**Section 1 - Purpose**
A receiving region shall exist in order to implement the purpose of this organization primarily through the cross-cultural ministries of AIM International members.

**Section 2 - Function**
    A. Implement International Council decisions and consistently apply its policies
    B. Conduct strategic, effective ministry within all units and teams
    C. Promote synergy within their region and among regions
    D. Provide member care, direction, and discipline for those under its jurisdiction
    E. Ensure that the legal requirements necessary for AIM International to function in its specific area are met
    F. Provide representation to International Council for the members through their executive officer

**Section 3 - Establishment**
International Council may establish a receiving region when it judges that accomplishing the purposes of AIM International would be enhanced. Receiving regions may be made up of units, teams, and individual members.

**Section 4 - Executive Officer**
An executive officer shall be appointed by the International Director with the responsibility to direct the activities of the organization within that region. This appointment shall be ratified by a majority vote of the ballots cast by the eligible members of that particular region. He shall serve a four year term and be eligible for reappointment. He shall not serve more than three terms consecutively. The executive officer shall be accountable to the International Director.

**Section 5 - Committees**
The executive officer will convene an advisory committee or committees to assist him in fulfilling his responsibilities. The purpose of these committees is for advice, coordination, and facilitating communication and feedback between members.  Composition of committees is to be designed to fit the opportunities of each region. These committees may be composed of leaders as well as members elected by peers.

**Section 6 - Units and Teams**
    A. The regional executive officer may establish a unit or a team to conduct ministry in a defined area under the direction of a leader.
    B. The regional executive officer shall appoint unit and team leaders as necessary for their region.
    C. Unit and Team leaders shall be appointed for a specific time defined at their appointment, but not to exceed four years. They are eligible for re-appointment.
    D. Unit leaders shall be ratified by the members from their unit.
    E. Unit and team leaders shall be accountable to their regional executive officer.

**Section 7 - Re-alignment and/or Dissolution**
International Council may re-align the composition of a region in order to enhance the effectiveness of AIM International. International Council may also close a region. In the event of cessation of ministry in a particular region, the assets shall be distributed under the direction of the International Council for use in accordance with the stated purpose of the organization.

**ARTICLE VIII POLICIES**

**Section 1 AIM International Council Policies**
International Council shall establish and modify council policies to direct its work in fulfilling its purpose.

**Section 2 AIM International Member Policies**
The International Council shall ensure the development, modification, and maintenance of member policies that shall be binding for all AIM International members.

**Section 3 Limited Policies**
Each region, unit, or team may establish and modify its policies which shall be consistent with AIM International policies.

**ARTICLE IX DISSOLUTION**

In the event of dissolution of AIM International all assets in excess of those required to liquidate liabilities shall be distributed to or placed in trust for one or more non-profit organizations which are in full agreement with Articles II and III of this Constitution. Such distribution shall be authorized by International Council and carried out according to the laws of the respective countries.

**ARTICLE X CONSTITUTIONAL AMENDMENTS**

Amendments to or revisions of this Constitution may be recommended to International Council by the International Director, or any Mobilizing or Receiving Region. A Mobilizing Council recommendation for amendment to or revisions of this Constitution shall be supported by a minute passed by a three-fourths majority of that council's membership. A recommendation from a Receiving Region shall be presented by its executive officer when it has been established that at least one fourth of the members of that Region are in agreement with the recommendation. Any amendment or revision must be circulated to the International Council at least one month prior to the next regularly scheduled meeting.

Amendments or revisions proposed by a two-thirds affirmative vote of the International Council at a plenary meeting shall be presented for ratification to all members of AIM International eligible to vote. These amendments or revisions shall become effective by an affirmative vote of two-thirds of the ballots cast.

# Appendix A: Core Values

The Constitution Committee and the Directorate worked to develop a list of core values that are essential to the ethos and culture of AIM International. The full IC expressed appreciation for the list and recognized the significance of maintaining these values. However, they also expressed concern that the Core Values really were not "governing policies" and as such, they should not be part of the new proposed constitution. The decision was made to make the Core Values part of the Policy Manual instead, so that they could be applied, but also discussed with the possibility of improving them without requiring a change to the constitution in the future.

**We Are God-Centered:**

- We acknowledge the absolute and final authority of God and his Word in all things
- We believe that our highest calling is to bring God the glory and worship he so richly deserves
- We embrace the essential role of individual and corporate prayer
- We depend upon God as the ultimate provider for our spiritual and material needs
- We recognize the centrality of the local church in the plan of God

**We Are Ministry Focused:**

- We are committed to establishing maturing churches among unreached peoples
- We are committed to developing Christ-like leaders
- We believe that ministries are enhanced through a life style consistent with the ministry context
- We are committed to learning local languages as an essential tool for effective ministry
- We express the life of Christ through teaching and practical demonstrations of his compassion
- We enter into partnerships with churches as an autonomous, nondenominational, mission organization
- We hold that integrity is essential in all that we do both as a mission and as individuals
- We look to the Lord in faith to supply all our needs while sharing information appropriately
- We cooperate with like-minded organizations to enhance accomplishing our purpose

**We Are Member Oriented:**

- We value the AIM International family as an expression of God's pattern of calling us to a life of community
- We are an organization governed by and accountable to its members whose opinions regarding ministry direction are valued by those in leadership
- We acknowledge that decisions are generally best made by those closest to the ministry
- We respect God's personal guidance in the life of individuals
- We respect the role of mission leadership and seek to identify, equip and empower servant leaders
- We value our families and commit ourselves to maintaining and enhancing the well being of our marriages and our children
- We are committed to help each member grow as they are transformed into the image of Christ

# CHARTER
## of the
## AFRICA INLAND MISSION
### INCORPORATED



We, the undersigned, all being persons of full age and each of us being citizens of the United States and three of us being residents of the State of New York, desiring to form a corporation pursuant to Section 41 of the Membership Corporation Law of the State of New York, do hereby make, sign and acknowledge this certificate as follows:

**FIRST:** The main purpose for which this corporation is to be formed is to carry on the work of evangelization in Africa without reference to denominational lines, limits or methods of procedure and to that end to organise, carry on and maintain missionary work and missionary stations in Africa; and in order to enable the corporation so to do, to organize and maintain in the United States and elsewhere throughout the world associations and persons interested in such evangelization work whether as missionaries, workers, associates or otherwise, and to co-ordinate, direct and co-operate with such associates and for the purpose of organizing, vitalizing and carrying on this work, to do any and all things which may be deemed necessary or proper and which are permitted to be done by corporations organized under the Membership Corporation Law of New York.

**SECOND:** The name of the Corporation is to be AFRICA INLAND MISSION INC.

**THIRD:** The territory in which its operations are to be particularly conducted is the State of New York and in such other places as may be found necessary or desirable in the operation of the corporation's activities.

**FOURTH:** The principal business office is to be located in the Borough of Brooklyn, City of New York, County of Kings and State of New York.

**FIFTH:** The number of its directors is to be nine.

**SIXTH:** The names and residences of the persons to be directors until the first annual meeting are:

| NAMES | PLACE OF RESIDENCE |
|---|---|
| Charles E. Hurlburt | Aba, Congo Belge, Africa |
| Oliver M. Fletcher | 145 Neck Road, Brooklyn, N.Y. |
| Frank E. Marston | 278 Lafayette Ave., Brooklyn, N.Y. |
| Walter F. Clowes, | 229 High Street, Nutley, N.J. |
| John L. Steele, | Elkins Park, Pennsylvania |
| Samuel R. Boggs | Melrose Park, Pennsylvania |
| Wm. L. DeGroff | 2422 Myrtlewood, Philadelphia, Pa. |
| Reuben A. Torrey | 536 S. Hope Street, Los Angeles, Calif. |
| Orson R. Palmer | 2444 N. 29th St., Philadelphia, Pa. |

**SEVENTH:** The names and post office addresses of the subscribers to this certificate are as follows:-


EXHIBIT
C

#2

**NAMES**

Joseph G. Deane
Walter Cook, Jr.
Philip A. Walter
Ralph Maiden
William B. Devoe

**POST OFFICE ADDRESS**

850  7th Ave., New York City
52 Hillside Ave., Englewood, N.J.
511 West 95th St., New York City
12 West 49th St., New York City
5 Duryea Road, Upper Montclair, N.J.

EIGHTH. The time for holding the annual meeting is to be on the second Saturday of June in each year.

IN WITNESS WHEREOF we have made, signed and acknowledged this certificate in duplicate.

Dated New York City, July 22, 1919.

Joseph G. Deane,
Walter Cook, Jr.
Philip A. Walter
Ralph Maiden
William B. Devoe

STATE OF NEW YORK )SS
COUNTY OF NEW YORK)

On this 22nd day of July 1919 before me personally came Joseph G. Deane, Walter Cook, Jr., Ralph Maiden, Philip A. Walter and William B. Devoe to me known and known to me to be the persons described in and who executed the foregoing certificate and severally acknowledged to me that they executed the same.

Harry S. Bracken
Notary Public Westchester County
Certificate filed in New York County
New York County No. 597 Register's No. 1421
Commission expires March 50, 1921.





# AFRICA INLAND MISSION

## Statement of Doctrine and Faith Basis

### The members of this Mission declare their belief in:

**SECTION 1**

The unity and trinity of God, eternally existing in three co-equal Persons, the Father, the Son, and the Holy Spirit.

**SECTION 2**

God, the Creator and Preserver of all things, who created man, male and female, in His own image, and gave them dominion over the earthly creation.

**SECTION 3**

The deity and humanity of God the Son, the Lord Jesus Christ, who, being very God, also became man, being begotten by the Holy Spirit, born of the Virgin Mary, was crucified, dead and buried, was raised bodily from the dead, and ascended to the right hand of the Father; whose two natures continue eternally and inseparably joined together in one Person.

**SECTION 4**

The deity and personality of God the Holy Spirit, and the necessity of His work to make the death of Christ effective to the individual sinner, leading him to repentance toward God and faith in the Lord Jesus Christ; and in His ministry, dwelling permanently within and working through the believer for godly life and service.

**SECTION 5**

The divine, verbal inspiration and infallibility and inerrancy of the Scriptures of the Old and New Testaments as originally given, and their absolute and final authority in all matters of faith and conduct.

**SECTION 6**

The universal sinfulness and guilt of human nature since the fall, rendering mankind subject to God's wrath and condemnation.

**SECTION 7**

The sacrificial death of our Representative and Substitute, the Lord Jesus Christ, the incarnate Son of God, by the shedding of whose blood atonement was made for the sins of the whole world and whereby alone individuals are redeemed from the guilt, penalty and power of sin.

**SECTION 8**

The necessity of the new birth as the work of God the Holy Spirit, to be obtained only by receiving the Lord Jesus Christ as Savior; that individuals are saved by grace through faith, not by works.

**SECTION 9**

The security of the believer, based entirely on the atoning work of the Lord Jesus Christ, whereby, as a born-again child of God, he has assurance of salvation and has the right to all the privileges of the sons of God.

**SECTION 10**

The responsibility of the believer to maintain good works, and to obey the revealed will of God in life and service, through which eternal rewards shall be received.

**SECTION 11**

The True Church, whose Head is the Lord Jesus Christ, and whose members are all regenerate persons united to Christ and to one another by the Holy Spirit.

**SECTION 12**

The observance of the ordinances of Baptism and the Lord's Supper as appointed by the Lord Jesus Christ.

**SECTION 13**

The supreme mission of the Church as being to glorify God and to preach the gospel to every creature.

**SECTION 14**

The personal and visible return of the Lord Jesus Christ.

**SECTION 15**

The resurrection of the body.

**SECTION 16**

The eternal blessedness of the saved, and the eternal punishment of the lost.



EXHIBIT

D

Over Please

**AFRICA INLAND MISSION INTERNATIONAL**
**P.O. Box 178, Pearl River, New York 10965**

Article V, Section 3B, of the AIM International Constitution   provides for continuation of membership in AIM as follows:

> Continuation.  In order to maintain membership in the
> organization. all members at the beginning of each term
> of service shall affirm, in writing, their adherence to
> the Constitution, By-Laws and Policies, and their full
> belief in the Doctrinal Statement.

Therefore, we request your completion of the following form.  It is important that this signed statement be returned the **Missionary Relations Office**, Pearl River, before your return to the field.

-----------------------------------

I assert my full belief in the Doctrinal Statement of the Mission as stated in Article III of the Constitution and reproduced on the reverse side of this form; and, as long as I am a member of the Mission, I agree to abide by and support the Policies of the Mission as stated in the most current editions of the AIM International Constitution and By-Laws and Procedures Manual.

SIGNED _____    SIGNED _____
                                                                    Spouse

DATE January 1, 2004                 DATE _____

3/00