UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **KRISTINA NEVIUS,**<br><br>　　　　　　**Plaintiff,**<br><br>　　　　v.<br><br>**AFRICA INLAND MISSION INTERNATIONAL, et al.,**<br><br>　　　　　　**Defendants.** | Civil Action 06-01965  (HHK) |

**MEMORANDUM OPINION**

Invoking this court's diversity jurisdiction, Kristina Nevius brings this action against her former employer, Africa Inland Mission International, Inc. ("AIM"), asserting causes of action arising from and related to her termination as a missionary in Namibia.[1]  Before the court is AIM's motion to dismiss Nevius's complaint for lack of subject matter jurisdiction and failure to state a claim for relief [#2].  Upon consideration of the motion, the opposition thereto, and the record of this case, the court concludes that AIM's motion must be granted.

**I.  BACKGROUND**

AIM is a non-profit religious organization based in New York which sponsors missionaries, primarily in Africa, to establish and support Christian ministries.  In June 1998, Nevius, a resident of the District of Columbia, joined AIM as a missionary.  Nevius alleges that

---

[1] Nevius also filed this action against Africa Inland Mission International, a separate international organization headquartered in Bristol, England, but acknowledges in her opposition that it "may not yet have been served."  *See* Pl.'s Opp'n at 1 n.1.  Federal Rule of Civil Procedure Rule 4(m) provides that if a civil action has not been served within 120 days of its filing, "the court, upon motion or on its own initiative . . . shall dismiss the action."  As there is no evidence the complaint has been served upon Africa Inland Mission International, the complaint shall be dismissed as against this entity pursuant to Rule 4(m).

she signed a standard AIM missionary contract which required her to raise sufficient money, through either fund-raising or her own funds, to cover the costs of her missionary work. AIM was to deduct and retain seven percent from the funds she raised for her own support; the remaining funds were to be provided to Nevius to defray her personal expenses. If she undertook a project which required funds above the cost of her personal support, she was required to raise those funds as well. Ten percent of those funds raised to fund a particular project were to be kept by AIM and the rest was to be given to Nevius to fund her service project. Her employment with AIM was also governed by its constitution, by-laws, policies and procedures, which provided that she was entitled to a hearing and an appeal if allegations of misconduct were raised. The by-laws also provide that missionaries "who [are] found not believing" may have their relationship with the mission terminated, and those whose conduct undermines the standing of the mission may be disciplined by several means, including termination. Def.'s Ex. A (AIM By Laws § IX).

In September 1999, Nevius was sent to Grootfontein, Namibia, where she established a soup kitchen to feed poor local children. Her work was initially supported by the local White-dominated church, which offered segregated services to parishioners, but that church eventually objected to the presence of Black children at her mission. Consequently, she relocated her mission and established the Mark 9:37 Mission Project, a home for abused, neglected, and orphaned children, with AIM's permission.[2]

In 2005, a dispute arose between Nevius and AIM. On April 7, 2005, Mick Rineer, the regional AIM supervisor, accused Nevius in the presence of others of mishandling AIM funds

---

[2] The Project was named after a passage in the New Testament of the Bible: "Whoever welcomes one of these little children in my name welcomes me; and whoever welcomes me does not welcome me but the one who sent me." *Mark* 9:37 (New International Version).

and negligence in caring for the children at the home. Rineer subsequently evicted Nevius and the children in her care from the Project's home. Ted Barnett, the director of AIM, sent Nevius a letter dated April 28, 2005, asserting that he had received reports regarding her abuse of children, of other missionaries, and her sexual behavior, and demanding her return to the United States. The letter indicated that Barnett would not share the details of the allegations against her until she returned to New York, at which point she would be expected to respond to them. Nevius asserts that AIM and officials from the local church were colluding to terminate her and the Project so they could turn the property into a "bed and breakfast" inn for Whites, which she contends constitutes racial and sexual discrimination. Compl. ¶ 34. Nevius was subsequently terminated without a hearing and AIM retained all charitable contributions that were raised for the Mark 9:37 Project.

## II. ANALYSIS

Nevius asserts the following claims: (1) breach of contract; (2) race and sex discrimination in violation of the District of Columbia Human Rights Act (DCHRA); (3) defamation; (4) unjust enrichment; (5) conversion; and (6) breach of trust and a demand for an accounting of charitable contributions to AIM. In its motion, AIM contends that these claims must be dismissed because (1) the "ministerial exception," derived from the First Amendment, deprives this court of jurisdiction over employment decisions of ecclesiastical organizations; (2) Nevius's DCHRA and defamation claims are barred by the one-year statute of limitations; and (3) Nevius has failed to state a claim for relief.[3]

---

[3] A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) or 12(b)(6) is appropriate only if it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations. *Martin v. Ezeagu*, 816 F. Supp. 20, 23 (D.D.C. 1993);

A.      **Ministerial Exception**

The First Amendment, in relevant part, provides that "Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof." U.S. Const. amend. I. It has long been held that the Free Exercise Clause exempts the selection of clergy from employment discrimination statutes and precludes civil courts from adjudicating such cases. *See, e.g., Minker v. Baltimore Annual Conference of the United Methodist Church*, 894 F.2d 1354, 1358 (D.C. Cir. 1990) (holding that state and federal laws barring age discrimination may not be enforced against church). This so-called "ministerial exception" is designed to protect the freedom of the church to select those who will carry out its religious mission. Otherwise, a judicial inquiry into a church's reasons for asserting that an employee was not suited for a particular religious post could result in an excessive entanglement in its affairs. *E.E.O.C. v. Catholic Univ.*, 83 F.3d 455, 462 (D.C. Cir. 1996); *United Methodist Church v. White*, 571 A.2d 790, 795 (D.C. 1990). The ministerial exception has also been applied to lay employees of religious institutions whose "primary duties consist of teaching, spreading the faith, church governance, supervision of a religious order, or supervision or participation in religious ritual and worship." *Catholic Univ.*, 83 F.3d at 461 (quoting *Rayburn v. General Conference of Seventh-day Adventists*, 772 F.2d 1164, 1169 (4th Cir. 1985) (internal quotation marks omitted)).

---

*Kowal v. MCI Commun. Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994). The court must construe the complaint in a light most favorable to the plaintiff and must accept as true all reasonable factual inferences drawn from well-pleaded factual allegations. *In re United Mine Workers of Am. Employee Ben. Plans Litig.*, 854 F. Supp. 914, 915 (D.D.C. 1994). The court is limited to considering facts alleged in the complaint, and any documents either attached to or incorporated in the complaint, matters of which the court may take judicial notice. *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624 (D.C. Cir. 1997).

### i. Discrimination Claim

In a case alleging employment discrimination, such as the present one, the application of the familiar burden-shifting rubric of the *McDonnell Douglas* test would quickly mire this court in a religious dispute which it may not properly resolve. *See Tomic v. Catholic Diocese of Peoria*, 442 F.3d 1036, 1040 (7th Cir. 2006). Nevius, who is White, asserts that she was unlawfully dismissed for illegal discriminatory reasons. AIM has indicated its intent to defend its employment action on grounds related to religious doctrine — that is, that its motivation in dismissing Nevius was not unlawful discrimination but rather was due to her failure to serve the mission's ecclesiastical needs. *See* Def.'s Mem. of Law in Support of Mot. to Dismiss at 5 (describing complaints lodged against Nevius regarding "her missionary duties and unbiblical behavior"). Nevius is likely to counter that the religious reason is merely a pretext for firing her, which AIM might rebut with evidence regarding the proper role and behavior of a missionary. Such an argument would swiftly devolve into a controversy over who is suitable to serve as a missionary of this particular organization, which is ultimately a theological dispute that cannot be decided by this court. *See DeMarco v. Holy Cross High School*, 4 F.3d 166, 171 (2d Cir. 1993).

Perhaps mindful of this obstacle, while Nevius describes herself as a missionary and acknowledges that AIM is a "Christian missionary organization," Compl. ¶ 5, she does not describe any of her duties or activities in Namibia as religious nor does she attach the written contract which may have set out her duties. AIM, in its motion to dismiss, contends that her duties included "the teaching and spreading of the faith" and to "regularly instruct others on the Gospel and teachings of Jesus Christ." Def.'s Mem. of Law in Support of Mot. to Dismiss at 11. AIM also points out that the Project was entitled "Mark 9:37," a reference to a passage in the

New Testament regarding Christ's encouragement of ministering to children. *Id.* at 12. The constitution and by-laws of AIM, referenced in the complaint and attached to AIM's motion to dismiss, make plain that the primary duty of its missionaries is to "make disciples [of Christ] of the people in Africa," Def.'s Ex. D (AIM Constitution Art. II), and that they may be dismissed if they are "found not believing the principles set forth in the doctrinal basis of the mission," Def.'s Ex. A (AIM By Laws § IX).

      Ordinarily, the court may not look to facts outside of the complaint — such as assertions in a motion to dismiss — in resolving a motion to dismiss unless those documents are incorporated by reference into the complaint. *Shapiro, Lifschitz & Schram, P.C. v. R.E. Hazard Jr.,* 24 F. Supp. 2d 66, 79 n.17 (D.D.C. 1998) (recognizing that "factual allegations in briefs are not properly considered on a Rule 12(b)(6) motion to dismiss"). However, the court may take judicial notice of a passage in the Bible. *See Truong v. American Bible Society*, 367 F. Supp. 2d 525, 528 (S.D.N.Y. 2005) (taking judicial notice of the age of the Bible). And the court also takes notice of the common definition of the word "missionary": "One who is sent on a mission, especially one sent to do religious or charitable work in a territory or foreign country," as well as "[o]ne who attempts to persuade or convert others to a particular program, doctrine, or set of principles; a propagandist." *American Heritage Dictionary* (4th ed. 2006). As evidenced by the plain language of the complaint and the documents incorporated therein, Nevius's duties certainly involved a material amount of "teaching" and "spreading the faith." Thus, resolving Nevius's discrimination claim would require the court to venture into an ecclesiastical dispute

which is barred by the ministerial exception. Accordingly, the court must dismiss Nevius's claim under the DCHRA.[4]

### ii. Breach of Contract Claim

A harder question is posed by Nevius's claim for breach of contract. The First Amendment does not "place the internal affairs of religious organizations wholly beyond secular jurisdiction." *Tomic*, 442 F.3d at 1039; *see also United Methodist*, 571 A.2d at 795. While the court may not mediate a theological dispute, a plaintiff may nonetheless survive a motion to dismiss her contract claim if she can show that "*some* form of inquiry is permissible and *some* form of remedy is available ..." *Minker*, 894 F.2d at 1360 (permitting plaintiff to proceed on claim for breach of employment contract). Thus, Nevius could maintain her breach of contract claim in this court if there were "neutral principles of law" which the court could apply without venturing into ecclesiastical territory. *Id.* at 1358 (explaining that the "neutral principles test . . . permits a court to interpret provisions of religious documents involving property rights and other nondoctrinal matters as long as the analysis can be done in purely secular terms").

Although principles of contract interpretation can ordinarily be applied in a neutral manner, the court's inquiry in this matter would tread too closely to religious affairs. The terms of the contract (as governed by the by-laws) permitted AIM to terminate Nevius for lack of religious faith or misconduct undermining the "standing" of the mission. Determining whether

---

[4] It should also be noted that the DCHRA has a one-year statute of limitations. D.C. Code § 2-1403.16(a). As AIM rightly notes, the most recent event complained of occurred in April 2005, but her complaint was not filed until November 17, 2006. Thus, Nevius's DCHRA claim would otherwise be time barred.
  Because the court has identified at least two reasons why Nevius's discrimination claim must be dismissed, it will not reach a third alternative argument that the conduct of which Nevius complains is not covered by the DCHRA because it occurred outside the District of Columbia.

AIM's termination of Nevius fell within these contractually-permitted parameters — or whether, as Nevius alleges, her termination was motivated by other concerns — would involve inquiring into "a core matter of ecclesiastical self-governance not subject to interference by a state." *Heard v. Johnson*, 810 A.2d 871, 882 (D.C. 2002) (dismissing breach of contract and defamation suit by pastor on the grounds that it could not be resolved without intrusion on religious decisions). And closely examining AIM's decision to close the Mark 9:37 Project would also involve inquiry into ecclesiastical decisions regarding how best to use the organization's resources, which would also be impermissible. *See Kelsey v. Ray*, 719 A.2d 1248, 1251 (D.C. 1998) (concluding that claim that a pastor failed to account for and report on church finances was barred by the ministerial exception because it could not be resolved without excessive intrusion). Thus, the court concludes that Nevius's breach of contract claim must also be dismissed.

**B.    Defamation**

Nevius alleges that AIM defamed her on April 7, 2005, when AIM's regional supervisor Rineer accused her, in the presence of others, of mishandling AIM funds and negligence in caring for the children at the home. Compl. ¶¶ 23–25. The statute of limitations for a defamation claim in the District of Columbia is one year. D.C. Code § 12-301(4). Defamation occurs on publication, and the statute of limitations runs from the date of publication. *Wallace v. Skadden, Arps, Slate, Meagher & Flom*, 715 A.2d 873, 882 (D.C. 1998). Here, the one-year limitations period ran out on April 7, 2006, well before the complaint was filed on November 17, 2006. Accordingly, Nevius's defamation claim must be dismissed because it is time barred.

**C.      Breach of Trust and a Demand for Accounting**

Nevius contends that AIM was holding certain donations in trust for her and that its failure to turn over those funds constitutes a breach of fiduciary duty.  In order to establish a breach of fiduciary duty, a plaintiff must establish both the existence of a fiduciary duty and a breach.  *Vicki Bagley Realty, Inc. v. Laufer*, 482 A.2d 359, 363 (D.C. 1984).  Trustees of charitable organizations are fiduciaries who are required to exercise ordinary and reasonable care in the performance of their duties, exhibiting honesty and good faith.  *Stern v. Lucy Webb Hayes Nat. Training School for Deaconesses and Missionaries*, 381 F. Supp. 1003, 1013 (D.D.C. 1974).  Charitable trusts are distinguished from private trusts in that they are operated "for some form of public benefit" and not for the benefit of any particular individual.  *Hooker v. Edes Home*, 579 A.2d 608, 611 (D.C.1990).

AIM contends that it is not a "trust" for the benefit of Nevius and thus it owes her no fiduciary duty.  As set forth in AIM's by-laws, incorporated by reference into the complaint, AIM is organized as a tax-exempt charitable organization under 26 U.S.C. § 501(c)(3), and donations to such an organization are tax-deductible.  The Internal Revenue Code requires that money donated to a 501(c)(3) be used "exclusively for religious, charitable, scientific, literary, or educational purposes."  I.R.C. § 170(c)(2)(B).  If the donations were to benefit a particular person, AIM would no longer be a charitable organization and its donors could not deduct their contributions from their taxes.  *See Davis v. United States*, 495 U.S. 472, 485 (1990) (concluding that § 170 does not permit deductions for donations for "personal use").

In a similar situation, the U.S. Tax Court determined that donations to a § 170 charitable organization that were designated for the support of individual missionaries in the Sudan were nonetheless deductible because the "mission had exclusive control, under its own policy, of both the administration and distribution of the funds donated." *Peace v. Comm'r Internal Revenue*, 43 T.C. 1, 7 (Tax Ct. 1964). The mere fact that the donors "designated three or four missionaries to be supported by their donations was no more than a manifestation of the petitioners' desire to have their donations credited to the support allowance of those individuals," but this did not change the fact that the funds belonged to the mission. *Id.*

Assuming the truth of Nevius's allegations, the donations made to AIM could not have been made in trust for her. Nevius acknowledges that AIM is a charitable trust, and under the applicable code provisions, AIM cannot simultaneously be operated as a charitable trust for the public benefit as well as a private trust for the personal benefit of Nevius. Moreover, Nevius has alleged no facts supporting the conclusion that an implied trust was created to divest AIM of the benefit of the donations. *See Save Immaculata/Dunblane, Inc. v. Immaculata Preparatory Sch., Inc.*, 514 A.2d 1152, 1157 (D.C. 1986) (holding that no express or implied trust divested religious order of property in favor of parents and students). Indeed, her allegations support the conclusion that AIM is a charitable organization and not a trust for her benefit. Nevius acknowledges that the funds she helped raise were "donated to AIM." Compl. ¶ 9. She also alleges that AIM deducted certain percentages of the funds, *id.* ¶¶ 9–12; that it authorized and funded the establishment of the soup kitchen and Mark 9:37 Project, *id.* ¶¶ 16, 20; and that it controlled the Mark 9:37 Project such that it had the authority to evict her and turn it over to another church, *id.* ¶¶ 24, 34. That funds donated to AIM were designated for her support does

10

not change the legal conclusion that the donations were donated to and their distribution was controlled by AIM, which precludes the possibility that the funds were held in trust for her. *See Peace*, 43 T.C. at 7. As Nevius has not alleged the existence of a private trust for her benefit, her claim for breach of trust and for an accounting must be dismissed.[5]

**D.    Conversion**

Conversion involves an "unlawful exercise of ownership, dominion and control over the personalty of another in denial or repudiation of [her] right to such property." *Savoy Const. Co., Inc. v. Atchison & Keller, Inc.*, 388 A.2d 1221, 1223 (D.C. 1978) (internal quotation marks omitted). Even where a defendant's initial possession of property is lawful, a demand for its return by the plaintiff may render the continued possession unlawful and show its adverse nature. *Id.*

As explained above, Nevius's allegations do not support the conclusion that the funds donated to AIM were held in trust for her. Moreover, as AIM correctly points out, Nevius does not allege that she or the donors have made a demand for return of the donations allegedly converted. *Shea v. Fridley*, 123 A.2d 358, 361 (D.C. 1956) (dismissing conversion claim because plaintiff failed to allege demand for return or show other facts sufficient to establish a conversion independent of any demand). Nor are the facts here sufficient for the court to conclude that conversion could be established independent of a demand. Thus, the claim must be dismissed.

---

[5] AIM also contends that Nevius has failed to join indispensable parties because — if her allegations are true — any donations that were made to AIM for Nevius's benefit were not eligible to be deducted, and thus any donors who deducted such donations from their taxes are necessary to this action. As the court concludes that Nevius has not alleged the existence of a private trust, the court need not reach this alternative argument.

E.   **Unjust Enrichment**

Under District of Columbia law, unjust enrichment occurs when: (1) the plaintiff conferred a benefit on the defendant; (2) the defendant retains the benefit; and (3) under the circumstances, the defendant's retention of the benefit is unjust. *News World Communications, Inc. v. Thompsen*, 878 A.2d 1218, 1222 (D.C. 2005). "There can be no claim for unjust enrichment when an express contract exists between the parties." *Schiff v. American Ass'n of Retired Persons*, 697 A.2d 1193, 1194 (D.C. 1997).[6]

As AIM rightly notes, Nevius did not confer a benefit on AIM; rather, the benefit was conferred by third parties who made charitable donations to AIM. Nevius's allegations, even if true, do not support the conclusion that Nevius was the intended beneficiary of those funds and consequently, she may not assert a claim for their recovery. Moreover, any inquiry into whether AIM has unjustly retained the funds would infringe upon territory that is protected by the ministerial exception, as explained previously. Accordingly, Nevius's claim for unjust enrichment must be dismissed as well.

---

[6] The court is not persuaded by AIM's contention that Nevius cannot allege an express contract while asserting a claim for unjust enrichment, a remedy designed for the absence of a contract. Pleading in the alternative is permissible under the Federal Rules of Civil Procedure, and a court must look beyond how a "complaint is styled" to determine if facts support any claim for relief under a theory of breach of contract or unjust enrichment. *See Miranda v. Contreras*, 754 A.2d 277, 284 (D.C. 2000); *see also* Fed. R. Civ. P. 8(e)(2) (permitting pleading in the alternative).

## III. CONCLUSION

For the foregoing reasons, the defendants' motion to dismiss [#2] must be granted. An appropriate order accompanies this memorandum opinion.

                                                    Henry H. Kennedy, Jr.
                                                   United States District Judge

Dated: September 24, 2007